Good morning, Counsel. Good morning to all of you. My name is Dale Gallipo, and I'm appearing on behalf of the Plaintiff and Appellant Robert Reese. Given the cross-appeal issues, I'm hoping to reserve five minutes. We'll see how that goes. Okay. Keep an eye on the clock. We'll try to help you, but— Okay. I appreciate it. The Appellant's position is that this case appropriately went to trial following denial of an MSJ. There was no interlocutory appeal filed. And the reason it appropriately went to trial, because there were disputed issues of fact. And some of those disputes included what shot struck Mr. Reese, whether Mr. Reese was holding or brandishing the shot, what was the distance, whether there was an immediate threat of death or serious injury to Deputy Rose at the time the shots were fired, and other factual disputes. As the Court is aware, the case went to trial, and not only did the federal jury find in the plaintiff's favor on the three claims, but perhaps equally or more importantly, they Some of those interrogatories included that— So let me ask you about — we're familiar with the record here. So juror question number 14. I read that as going to the excessive force claim issue. So the question was, at the time Deputy Rose fired his shot, did it appear that the plaintiff posed an immediate threat of death or serious physical injury to Deputy Rose, to which the jury answered no. And that tracks the language in Tennessee v. Garner. So that deadly force is permissible only when the officer believes there's a threat of serious physical harm. So that question seemed to go to prong one of the qualified immunity issue. Was there a constitutional violation? But I don't see — your briefing seemed to suggest that would also go to prong two, which we've said in Morales is a question for the judge whether the — a reasonable officer would have known that it was a violation of a right. Morales says that is for the judge to decide and that it should be based on factually similar cases. Now, do you disagree with that? I do not disagree — well, I disagree in part and agree in part. I do agree, and I think there's been a lot of cases recently about qualified immunity and about whether you need a case on all fours or not, or similar facts, as you're suggesting. Well, the Supreme Court has told us in no uncertain terms that we should be looking and they've reversed us numerous times, that we should be looking for a case with closely similar facts. Yes. So I believe the answer to question 14 goes both to the first prong and the second prong. But it doesn't — it doesn't tell us anything about case law, so I'm not sure why it does. Well, the reason is — But the second prong is supposed to be, according to Morales, is to find that as of March 2011, when the incident occurred, there was a case fairly close on point, and we said, according to Morales, the judge has to find that. Well, the reason it does, from the plaintiff's perspective, is because this — this is somewhat unique because we're looking at the second prong of qualified immunity post-jury verdict. And so we have to assume all the facts in favor of the plaintiff, and there is numerous cases. Not only Tennessee v. Garner, there is Roderick v. Harris, Kernow v. Ridgepress, Durley v. Rutherford. So none of those are actually on — very close on point. I mean, I looked at the ones cited in your brief, Harris, Smith v. Hammett, Wilkinson v. Torres, and I — they're factually not particularly close. So which fact — which case do you think is factually the closest? Well, I think they're all important for the following proposition. We have deadly force, and there's deadly force. Well, but the courts told us not to look at general propositions. They said, look at the circumstances, the factual circumstances of the case. They've struck us down on numerous occasions for doing just that, looking at a general principle. Well, but the point is, is that all of these cases involve weapons, guns and knives. It's clear, and the law was clearly established, you cannot shoot someone merely for seeing a gun in their hand or a knife in their hand. But you can go into a room where there's a crazy person with a knife in order to shoot her. I mean, the Supreme Court has just told us that in she-hand. Well, but that's why the facts of this case are so important. You have a man who's in his own home. Right. But which case — I understand the facts are very sympathetic, but which case is on point? I would say every single case that we cited, and including in the Rule 28 — So Harris's, the Ruby Ridge sniper case, they were a mile away when they picked off the man's wife. I mean, why is that factually similar? If you're asking me if I have a case with similar facts to someone who's in their apartment and they're knocking unannounced and he opens the door — And he has a knife in a striking position. No. And is within arm's distance. The jury did not find that. The jury found he did not have a knife in a striking position. He never brandished it in a threatening manner. In fact — I thought he was convicted of that. No. That was with — there was a conviction, but that was before the police ever got there. That was — Well, I have this. At the time plaintiff opened the door, did he have a knife in his hand in an elevated position? Yes. Sure. That was as soon as he opened the door. He shot within a second. That shot missed him. He retreats into his apartment, having committed no crime at this point. He drops the knife. Well, the jury didn't find that. They just said that they couldn't see the knife. Well, that's a reasonable inference, and we have to take all the reasonable inferences — But that's not a fact found by the jury. But it's a reasonable inference. We're not on summary judgment. We're after trial. I know. But I believe, Your Honor, that we have to take all reasonable inferences to support their verdict. And so they may have disbelieved Deputy Rose entirely, that he ever saw a knife at all. Deputy Rose said he was hiding when the door was open, and if he saw a knife, one wonders why he'd want to close that distance. Deputy Rose himself admits he never saw a knife. So from our position, every single case that says you can't shoot someone just because you see a gun or knife in their hand, there has to be an immediate threat, that is governing here because there was no immediate threat to Deputy Rose. Well, I think Mr. Reese testified that he only heard one shot, which seems to support the district court's observation about the fluid nature of the events. And I think Deputy Rose testified something like it was a millisecond when all of this happened. So doesn't this sort of create this instantaneous fluid event that occurred? So it's not necessarily something that's long and drawn out, as it seems to appear in the brief. Well, I don't think, to answer your question, did it happen over a relatively short period of time? Yes. However, I think there was significant time, at least two seconds, perhaps more, in between the first shot. And remember, Deputy Brown immediately observed the threat had stopped. That's why he only fired one shot, because he saw the knife lower, he saw Mr. Reese step back. There was no more threat. Two seconds later, Deputy Rose approaches, and without seeing a knife at all, without any advancement, any command, any warning, shoots him in the chest from three feet away in his own apartment. But, counsel, with respect, I think you know I understand these kinds of cases and have great empathy for the victims of excessive force. But I also am very much aware, as my colleague has pointed out, the Supreme Court has chastised our court repeatedly, as well as other courts, for not seeing things from the perspective of the law officer on the scene in the milliseconds involved. And when there's been a brandishment, which clearly occurred here with the knife when your client first came out, and you indicate it was very quick, it was a matter of seconds. And, of course, anybody that's been in a frightening situation, your adrenaline is up, these officers, with the brandishment, you can see why they would feel that they were under threat. We don't know what Rosen saw exactly, and I don't think the jury found that, unless I'm mistaken. So aren't we stuck with the fact that, for the Supreme Court's perspective, they say that only a most incompetent or reckless officer would not understand whatever law governs here. And in this case, he comes out with a knife, that's clearly a threat, they clearly would have a right to do something there. If Rosen didn't see him drop the knife, and I don't know what evidence there is of that, couldn't he reasonably believe that they were still under threat? Because the knife is a dangerous weapon. It's a dangerous weapon, but without seeing it, and we believe that it was dropped and not in his hands, and without a threat. But, yeah, I respect that. I understand what you're saying, but I'm saying from the perspective of the law enforcement officer, again, we're talking seconds, the guy comes out, he's clearly thinks they're under threat, he goes in, maybe he's on the floor. But does Rosen know that? And if he doesn't know that, isn't he entitled to shoot? I would say no. What case would you cite for that? Well, I would, one of the cases I would cite is one of your cases, Your Honor, and you recently authored an opinion in a case called Lopez. I know that one well. I read it, and a very well-written opinion. But the AK-47, it was a replica gun. But, of course, that case was six years after the event, so it isn't something that we can consider. Right. And I agree with my colleague on that. Well, but the point is, the cases that are cited for the law being clearly established in that case, which include the cases we're talking about, Curnow v. Ridgecrest and others, Harris. But George is right on point for Lopez. The case George is the main case that's relied on there, and it's not applicable here. Of course I understand that. And in this case, Andy Lopez never raised the arm, whatever it was, the air gun. In this case, though, with respect, counsel, you've got a man with a knife, and that's a brandishment. And the Supreme Court's been really clear, if there's a brandishment, the law enforcement officers, if they feel threatened, they have an ability to protect themselves. But that's why I respectfully disagree, because I do agree he opened the door. Everyone agrees he had a right to have a knife or gun in his hand. He didn't know who it was. He's in his own house. It's 4.30 in the morning. He shot within a second. I don't think the jury ever found a brandishing on anybody. He had the knife visible. They said it was somewhat in an elevated position. But when they were asked the specific question, did he brandish that knife at Deputy Rose, either generally or in a threatening manner, they said no. Let me ask you this, counsel. Under Supreme Court law, does it matter what the jury found about the brandishment issue? Or isn't it, rather, the perspective of the officer on the scene in that second, whether he, in this case, perceived a threat? Does it matter what the jury thought? It does. It clearly does. Well, the jury is deciding the facts. I think one of the cases we cited was the AK versus the California Highway Patrol, giving deference to all the jury's findings. I mean, qualified immunity is an affirmative defense. The defense had the obligation to cite questions that they felt, if answered in their favor, would enable a court to grant qualified immunity. They failed to do so, and the questions that were proffered were answered in the plaintiff's favor. There's no challenge to the excessive force determination. And that's what the jury's responses went to, and those are bindings. The question now is for the judge whether it was clearly established, and that goes to finding another case. May I make three points, because I see my time is dwindling away? First of all, on the Bain Act. One of the things that I think is going on here is that the issue becomes attorney fees could be obtained either by the Fourth Amendment or the Bain Act. The judge seemed to, I don't want to say ignore. That might be too strong of a word. But again, there was an opinion written by Judge Smith on the Bain Act that in 2013 that basically said a Fourth Amendment violation, I believe it was Cameron, is a Bain Act violation. There was a follow-up opinion of Chowdhury, and in our 28th letter we submitted a recent opinion from the Court of Appeals. All that say a Fourth Amendment violation is a Bain Act violation. So we believe the jury instruction given to the jury was correct on that, and the Bain Act should be clearly reinstated. We also believe that the training of the officer when he admitted himself that he knew you can't shoot someone just because you see a knife in their hand and there has to be an immediate threat of death or serious injury, that there is a direct threat of death. So we believe that the defense has failed to create a clear evidence that the law was clearly established. We simply feel that the defense has failed to create the evidence that the law was clearly established. I understand the arguments. I understand the thoughts. They were made to the jury and disregarded.  They wanted to have come to trial that didn't come to trial. The 417 plea had no victim named. It's the plaintiff's position she was the victim of that 417, which is supported by the record in this case that he had a knife when he had this prior encounter with her. There is no evidence that says that conviction was against any particular deputy. It's their burden under Hectory-Humphrey to establish that. And even if that did occur, which we believe the jury specifically found it did not, we still don't believe it would have precluded the finding here because the question is what happened in the split second when he opened the door is different than what happened two or three seconds later when Rose shot. In fact, the jury may have discredited Rose's entire testimony because they're the ones that are judging credibility. And we're now in a position post-verdict to try to guess what they were thinking. And if there were particular questions that they thought would help their qualified immunity, they should have proposed them. I think your time is up. Yeah, I know. I'll ask my colleagues if they have additional questions. All right. Thank you very much. Thank you all very much. We'll hear from the government. Good morning, Your Honors. May it please the Court. My name is John Whitefleet. I represent Deputy Rose and the County of Sacramento. I want to briefly address the two issues, the Qualified Immunity and the Bain Act, that are on appeal by Mr. Rose, and then the cross-appeal issues. And I want to highlight certain aspects of those. But basically, because the qualified immunity issue is one for the courts to decide, the real issue is, in 2011, was there case law that existed that put this officer on notice? There wasn't. And the case that we cited, and I wanted to focus more on the period between the judgment and today that both parties have submitted to this Court for the additional cases that, for the Court's consideration. Let me ask you this question. Most of the cases that we unfortunately get about excessive force and the use of qualified immunity occur before a trial. Indeed, that's the whole idea, is to block a trial. And the Supreme Court's been very clear about that. We're in a little different situation here, where, in fact, the judicial process said, this has got to go to a jury. It went to a jury, the jury made certain findings. Is our analysis of qualified immunity post-trial, post-jury verdict, the same as it would be under Pearson pre-trial? In essence, Your Honor, I would go back, harken back to the Saussure, before the trial, first you decide the Constitution issue, then you decide whether the law was clearly established. Not just the order. And now the order is gone. And from our perspective, it's really a matter of, was the law clearly established? Because assuming a constitutional violation, as the Court pointed out, of excessive force, then the question is, was that on the contours in connection with these  With respect, what I'm getting at here. Maybe I misunderstood your question. Not what Saussure says, not what Pearson says. I'm talking about the time framework in which we conduct the analysis. What we do before a trial, unfortunately, we see that all the time. It's really quite unusual for us to see a case where the case has gone to trial, a jury has made a determination of certain critical facts that may indeed bear upon whether the officer's position was reasonable. And now the government is coming and saying, well, you really can't consider that, because there was no case on point at the time. So what I'm looking for is some help on whether we apply the same analysis post-trial that we do pre-trial, and I'd like you to give me some case law that would buttress your position. Frankly, Your Honor, I'm not sure that I can provide the court with that guidance. I thought we addressed that in Morales. Are you not familiar with that case? Not offhand, Your Honor. That's a 2017 case, Morales. It says we bifurcate it, and only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved. And I believe that's essentially the same position we have here, a finding of excessive force, and then the issue of whether the law was clearly established. So I – for me, the analytical framework doesn't have any difference, because the way I see the idea that the disputes of fact have been resolved, and a large majority of the court's decisions, Your Honor, find a dispute of fact before quality of immunity can even be decided. And so now that we have those facts resolved – I'm in agreement with my colleague, which is that Morales says that at this point of the proceeding, we rely upon the jury for a determination of the facts, but it's the judge's call whether or not there was a case on point to put the officer on notice. And even at this point, if there was no such case in 2011, then the jury kind of loses. Is that correct? We have no basis to dispute with that, Your Honor. So I would agree with that. So you like Morales? Again, I'm not that familiar enough with the case to be able to say one way or another, unfortunately. Well, I want to read that for lunch. It's a really good case. I will, Your Honor. The – this Court's recent decision in Woodward v. City of Tucson, now published at 870 F. 3rd, 1154, which we provided to the Court in our Rule 28J letter, is fairly on point as well. And because that one, it was a stick that was being brandished over the head, and the Court found qualified immunity in that case. And the other cases that plaintiff relies on are simply too factually distinguishable to be able to provide this Court with any guidance under the facts of this case. So, for example, plaintiff cited Zion v. County of Orange. In that case, the officer shot 18 times, nine of which occurred after the suspect was already down on the ground and prone. And there was some video that contradicted the officer's statement. And so, in the end, where there's a dispute of fact, that doesn't help plaintiff in this case. Because there was no case at the time that said that was inappropriate? It was just a dispute of fact in that case, Your Honor, in terms of the – But let's just say we have case law now, which we do, that makes it very clear that if the victim, if you will,  you can't just kill him. In other words, if you're a law enforcement officer and you're walking along the street and you see somebody that appears to have a gun, you can't just shoot them, right? In the broadest of terms, Your Honor, and what is a threat is obviously sometimes disputed. In this case – What if the officer is a little unbalanced and he perceives threats all over the place? He's been in the military, he's got PTSD, and he sees somebody, he thinks they're a Taliban person, he shoots them and they don't have any threat at all. Is that okay? And that probably would go back to the – whether a reasonable officer would believe that. It's an objective standard, Your Honor. And obviously, a reasonable officer perhaps wouldn't perceive those instances. And so, that we have milliseconds between the first shot, the knife being seen, and I want to correct the plaintiff's counsel's statement. At the record, at 151, Deputy Rose indeed says he saw the knife, milliseconds, and then heard the shot, and then turned into the doorway and was surprised to see Mr. Reese there. Well, I saw in the record that – I think in response to defense counsel's question to Officer Rose, the question being, when you saw him, that is, Mr. Reese, standing there in the threshold of the door, you did not see a knife in his hand. Would you agree with that? And Officer Rose said, I would agree with that. And he went on to say it's because he never saw his hands. So, he never looked in that area because his focus was on his body and not where his hands were at the time. And so, in the end, the jury found – His hands are not part of his body? In the millisecond that he took to evaluate whether he was still a threat or not, he believed he was because he couldn't see anything. And you go from this to this. Can you tell whether there's still a knife in his hand or not? Ultimately, the jury found that Deputy Rose didn't see his hands. So, he wasn't in a position to be able to see whether he had a knife or not. Well, and similarly, Officer Brown testified that he only – and he said this – he only fired one shot because, from his perspective, after he fired his shot, the threat stopped. So, how do we evaluate those types of statements and testimony in the posture that we're in here? From the different perspective of the officer. Because Deputy Brown was 20, 30 feet away, had a clear view of Mr. Reese, and could see him, after the shot fired, retreat. Deputy Rose didn't have that vantage point. And so, what he sees is the knife coming through the threshold, here's the shots fired, and then he disappears. And that millisecond rounds the corner of the threshold of the door, and he sees him still standing there three feet away. And that's why Deputy Brown's vantage point doesn't necessarily mean that Deputy Rose didn't reasonably perceive the threat. So... Can you address the Bain Act issue? I'm a little confused because the jury instructions for California law and the language of the statute itself have an intent element and it doesn't make it on all fours with a Section 1983 excessive force claim. So, how do we deal with the jury instructions and then the strange district court recanting of the jury instructions? We believe that the district court correctly determined that once the correct analysis was there had to be some independent action of threat, intimidation, or coercion for which it was intended to interfere with a right. What was the constitutional right here? The right to be free of excessive force? I would assume so, yes. So, it would be a Fourth Amendment right? Correct. And so, what do we do with the language in Cameron v. Craig which says that there's no California right different from the rights guaranteed under the Fourth Amendment, so the elements of the excessive force claim under the Bain Act are the same as under Section 1983? And we would submit, Your Honor, that that would render the language of Bain Act superfluous in terms of whether threats, intimidation, or coercion are necessary as part of an intended act to interfere with a right. And plaintiff's counsel cited to this court Cornell v. City of County San Francisco as a recent California appellate decision. And I think it's important to look at that because that case actually found that a specific intent is necessary for the officer to violate the right that was in. And from our standpoint, the fact that the Fourth Amendment is a passive right, not something that somebody exercises, per se, but something that inherently enjoys. And the idea that the Cornell case now is saying there must be evidence of a specific intent to violate that right means that the district court can be affirmed on that basis. Is this something, the interpretation of the Bain Act, vis-a-vis excessive force, is this something that we should certify to the California Supreme Court? Because there's really no California Supreme Court guidance on how the Bain Act applies in this context. Particularly when it's only excessive force. Because, unfortunately, Cornell is also an unlawful arrest and a pointing of a weapon, which is akin to the Robinson case. But it sort of makes the distinction between certain seizure versus excessive force. The manner in which the seizure occurred usually is a connection with an arrest. So here, there is no issue about an unlawful arrest, an unlawful seizure. This is just an application of force. And so, I believe that, in order to affect the plain language of the Bain Act, requires the necessary independent act. Like the Lyell court did, fairly recently, that we cited in the brief. And how do you view Cornell? Doesn't that say that's not necessary? So the Cornell case, actually, in dicta, mentioned the excessive force issue. But because that case factually was about an unlawful arrest, basically, the officers chased down a fellow officer at gunpoint and then interrogated him for six hours, searched vehicles, hospital tests, found the drug negative, and then he ended up getting fired. And so the court easily found that there was some intimidation and threats to force him out of employment. So it's fairly factually easy to look at the Bain Act. My recollection is that the Cornell court focused on what the district judge had done in the other case and disagreed with the district judge's construction of the Bain Act requirements. There's no separate element required. Is that right? I would disagree, Your Honor, in terms of the because that one was about an unlawful arrest and the pointing. And so that's why there wasn't this independent act issue. So briefly about the cross-appeal, there's two issues we want to address. The argument that the 417 conviction and sentence bars the act. And here's why we think that the issue about the victims being the police officers, because the only evidence in the case was that the victim was Deputy Rose. That was the only testimony that the knife was raised immediately after the crossing of threshold and Deputy Rose was within three feet. But opposing counsel says that the act that resulted in the conviction under 417 was the Brittany Shurtleff incident. There's no evidence of that, Your Honor. There's no evidence the other way about the conviction. There's nothing about the conviction, is my understanding. The conviction, the original charge was a 245C, which is actually against an officer. The second count was a 417, which we would submit is just a secondary of the 245C. So what happened to the 245C? It's not in the record, is it? It's part, just in terms of the docket, the criminal docket, it is part of the record. But it's not the ultimate conviction? Correct. And so even with the evidence that you state is in the record with respect to the 417 conviction, is that sufficient to meet your burden here? It is, Your Honor, insofar as the how can the conviction 417 be reconciled with the jury's verdict of saying he did not brandish the weapon at Deputy Rose. And so we have a conviction for brandishing and a jury finding that, in our view, is simply inconsistent. The last issue I want to raise is Battery. We have other questions? No. We're going to have to cut you off, but we thank you. Thank you. We thank counsel for the appellant. And the case just argued is submitted.
judges: M. Smith, Ikuta, Humetewa